# Illinois Official Reports

## Appellate Court

---

### *People v. Albarran*, 2018 IL App (1st) 151508

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ULLYSSES ALBARRAN, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-15-1508 |
| Filed | September 24, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-20947; the Hon. Diane Cannon, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and David T. Harris, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Christine Cook, Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Walker concurred in the judgment and opinion. |

**OPINION**

¶ 1      Defendant Ullysses Albarran was charged with criminal sexual assault and predatory criminal sexual assault of a child for allegedly engaging in sexual conduct with his daughter while she was under the age of 13 years old. A jury found defendant guilty of one count of predatory criminal sexual assault and one count of aggravated criminal sexual abuse, and the circuit court of Cook County sentenced him to a total of 37 years' imprisonment. Defendant appeals. On appeal, defendant challenges certain pretrial rulings, asserts that his trial counsel provided ineffective assistance, and argues that the circuit court's noncompliance with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) warrants plain error relief. For the following reasons, we affirm.

¶ 2                                    BACKGROUND

¶ 3      In November 2011, a grand jury indicted defendant on seven counts of criminal sexual assault, two counts of predatory criminal sexual assault of a child, two counts of aggravated criminal sexual abuse, and one count of sexual relations within families. The indictment alleged that defendant committed the offenses in Cook County between November 24, 2003, and November 24, 2008, against his daughter, T.A., who at all relevant times was under the age of 13 years old.

¶ 4      Prior to trial, defendant made an oral request to subpoena T.A.'s mental health records. Defendant asserted a belief that T.A. suffered from emotional issues such as depression and antisocial behaviors and that she had exhibited making untrue and make-believe statements that would affect her credibility at trial. Additionally, defendant requested that the circuit court conduct an *in camera* inspection to determine whether any of T.A.'s mental health records contained relevant information. After the parties briefed the issue,[1] the circuit court conducted a hearing, heard oral argument, and denied defendant's request to subpoena T.A.'s mental health records.

¶ 5      Defendant also filed a motion requesting a bill of particulars. He requested the "exact date(s) or the date(s) within close proximity, that the predatory criminal sexual assault and criminal sexual assault charged are alleged to have occurred" and "the number of times the charged conduct is alleged to have occurred." In a written response, the State asserted that the alleged incidents took place between November 24, 2003, and November 24, 2008, "approximately six times." The circuit court held a hearing on defendant's motion. The State argued that it provided defendant with all of the discovery it had, including interviews with the victim and police reports, which listed the dates and times of the alleged incidents, all of which allegedly occurred when T.A. was approximately between the ages of 6 and 11 years old. The circuit court stated, "I'm at a loss as to how [the State] could more particularize" the information sought by defendant. The circuit court did not order the State to provide any additional information in response to defendant's request for a bill of particulars. At no time did defendant seek to dismiss or quash the indictment or otherwise assert that the indictment itself was insufficient.

---

[1]The State's written response is not included in the record on appeal.

¶ 6        During jury selection, the circuit court asked the first panel of potential jurors, "Does everyone accept the principle that the defendant is not required to offer evidence on his own behalf?" The record reflects that the potential jurors answered in the affirmative. The circuit court, however, did not ask the first panel of potential jurors whether they understood that principle. The circuit court asked the first panel of potential jurors whether they both understood and accepted the principles that the defendant is presumed innocent of the charges against him, that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt, and that the defendant's failure to testify cannot be held against him. All of the potential jurors responded in the affirmative. Eight jurors were selected from the first panel. The circuit court properly polled the remaining panels of prospective jurors on each of the four questions.

¶ 7        At trial, T.A. testified that she was born in November 1997, that defendant was her father, and that Jeanette S. was her mother. T.A. lived with both of her parents before they separated. She testified that during the summer when she was either six or seven years old, she and defendant were in her parents' bed while her mother was at work. T.A. was in her nightgown and underwear, and defendant was just in his underwear. Defendant was on his back and pulled T.A. on top of him and began moving around and rubbing his erect penis against her vagina without removing his or her underwear. When T.A. tried to get away, defendant held her down. She did not scream while it occurred because she was scared. T.A. said that defendant smelled of alcohol that night. At some point, defendant stopped and went to the bathroom. T.A. did not tell anyone because defendant told her not to. T.A. further testified that before she turned nine years old, she was again in her parents' bed with defendant while her mother was sleeping downstairs on the sofa. Defendant pulled down T.A.'s underwear and put his penis in her vagina. She did not scream because she was scared. She testified that defendant stopped abusing her before she turned nine years old.

¶ 8        T.A. described a time when she was in a vehicle with defendant and he told her that if a family member did anything illegal that she should not turn them in because she would be a traitor. She also testified that she made tally marks on the side of her bedroom dresser with a knife tallying the incidents of abuse by her father. The State introduced photographs of the dresser showing 19 tally marks. T.A. admitted that she did not tell the police or anyone else about the tally marks on the dresser until one week before trial. She further stated that the tally marks were just an "estimation," that she made the tally marks "on separate occasions in groups," and that she could not recall which tally marks were the most recent.

¶ 9        T.A. testified that she first disclosed the sexual abuse in September 2011 to her then boyfriend Jeffrey. Both T.A. and Jeffrey were 13 years old at the time. T.A. did not identify defendant as the person who sexually abused her. Jeffrey then told a teacher at their school about the abuse. On October 21, 2011, T.A. went to school and disclosed the abuse. She testified that the police arrived and took her to the police station where she told the police about the abuse.

¶ 10        Jeanette, T.A.'s mother, testified that she moved herself and her children out of defendant's house in June 2010 due to marital issues and defendant's alcohol use. In October 2011, Jeanette received a phone call from T.A.'s school asking her to come to the school. While there, Jeanette learned for the first time of T.A.'s allegations of abuse against defendant. Jeanette testified that when defendant would visit their children after they moved out, T.A. would give her a hard time about having to spend weekends with him and would

say that she did not want to go. Jeanette acknowledged that she had not told the police about T.A.'s feelings about having to spend weekends with her father. On October 25, 2011, Jeanette learned that defendant had attempted to commit suicide. Jeanette spoke with defendant while he was in the hospital and asked him about T.A.'s allegations, to which defendant responded, "I don't know unless I was drunk."

¶ 11   Danielle Komen, a social worker at Illinois Masonic Hospital, testified that she spoke with defendant on October 26, 2011, after he was admitted on October 25, 2011, due to multiple self-inflicted stab wounds. Komen stated that defendant had been given morphine that day. She asked defendant why he hurt himself and he responded that he was "feeling guilty about things in life" and that his daughter was in the hospital. During the course of their conversation, defendant stated that he touched T.A.'s butt and that he had touched her vagina underneath her clothes, but he denied having sexual intercourse with T.A. or ever exposing himself to her. When Komen told defendant that she was a mandatory reporter and that she would have to report his statements, defendant asked if he was going to jail and if Komen was going to tell his mom. Komen stated that defendant could not remember the time frame in which he touched his daughter, but he said that it happened "multiple times." Komen testified that she clearly remembered defendant's statements because it was the only time that someone had admitted to her that they had inappropriately touched their child.

¶ 12   Detective Adam Katz testified that on October 25, 2011, he was assigned to defendant's attempted suicide case. On October 26, 2011, Katz went to the hospital to interview defendant but was unable to do so because defendant was in critical but stable condition. On October 27, 2011, Katz interviewed defendant who said he was overwhelmed. Defendant did not tell Katz that he abused his daughter or that he felt guilty about anything because Katz "didn't ask him about that."

¶ 13   Detective Jose Castaneda was assigned to investigate T.A.'s allegations. T.A. initially told Castaneda that she had been abused three times but then gave him a different number. She told Castaneda that defendant told her not to tell anyone. Castaneda testified that he had handled over 1000 child sex abuse cases and that in 85% of those cases the child did not report the abuse right away. On cross-examination, Castaneda stated that many of these cases went to court. The circuit court sustained the State's objection to defendant's question as to the number of those cases that resulted in a conviction.

¶ 14   After the State rested, defendant made an oral motion for a directed verdict, which the circuit court denied. Defendant then proceeded to call two witnesses. First, Detective Castaneda further testified that Jeanette did not tell him that T.A. gave Jeanette a hard time about T.A. having to spend time with defendant on the weekends. Second, Naahreet Romero testified that she was T.A.'s cousin and that they "grew up together." They were close and confided in one another. Naahreet would sleep over at T.A.'s while they were growing up, and that if it was not every weekend, it was every other weekend. When both Naahreet and T.A. were 6 to 10 years old, they would play with dolls in T.A.'s bedroom. Naahreet testified that she did not recall ever seeing tally marks on T.A.'s dresser but also acknowledged that she did not ever inspect the dresser.

¶ 15   After hearing closing arguments, the jury found defendant guilty of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. Defendant filed a posttrial motion for a new trial that asserted, in part, that the State failed to provide sufficiently specific information in the bill of particulars and that the circuit court erred by denying

defendant's request to subpoena T.A.'s mental health records and by failing to conduct an *in camera* review of those records. The circuit court denied defendant's motion for a new trial and sentenced defendant to consecutive sentences of 30 years in prison for predatory criminal sexual assault and 7 years for aggravated criminal sexual abuse. Defendant filed a timely notice of appeal.

¶ 16                                                ANALYSIS

¶ 17    On appeal, defendant raises four arguments. First, he argues that the indictment was unreasonably broad because it spanned a five-year period, and that circuit court erred by not requiring the State to provide more specific information in a bill of particulars. Second, he argues that his trial counsel was ineffective by failing to object to T.A.'s testimony about the tally marks on her dresser, Castaneda's testimony about the number of child victims who fail to report abuse right away, and improper arguments in the State's closing argument. Third, defendant contends that the circuit court's failure to properly admonish the jury during jury selection amounts to first-prong plain error and that the evidence was closely balanced, warranting a new trial. Finally, defendant argues that he was deprived of his right to a fair trial where the circuit court denied his request to subpoena T.A.'s mental health records and refused to conduct an *in camera* review of those records. We address these arguments in turn.

¶ 18                                         A. Bill of Particulars

¶ 19    Defendant first argues that the indictment was "unconstitutionally overbroad" because it spanned a five-year period. He relies primarily on out-of-state cases to argue that the time period in the indictment was so overbroad and vague as to be unconstitutional. He further argues that the circuit court erred by not requiring the State to provide more specific information in a bill of particulars. He contends that the indictment was insufficient under section 111-3(a) of Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/111-3(a) (West 2010)) because it failed to give any indication of when the alleged offenses occurred. Defendant argues that the lack of specificity in the indictment "virtually ensured that [defendant] would not be able to present a meaningful defense" and that the circuit court should have ordered the State to provide more specific information.

¶ 20    A defendant has a fundamental constitutional right to be informed of the nature and cause of the criminal accusations made against him. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Meyers*, 158 Ill. 2d 46, 51 (1994). In Illinois, section 111-3(a) of the Criminal Code is "designed to inform the accused of the nature of the offense with which he is charged so that he may prepare a defense and to assure that the charged offense may serve as a bar to subsequent prosecution arising out of the same conduct." *People v. Simmons*, 93 Ill. 2d 94, 99-100 (1982). Where the sufficiency of the charge is challenged both before trial and in a posttrial motion, the charge must be found to strictly comply with section 111-3 of the Criminal Code. *People v. DiLorenzo*, 169 Ill. 2d 318, 321-22 (1996). Whether the charging instrument was sufficient is a question of law that we review *de novo*. *People v. Espinoza*, 2015 IL 118218, ¶ 15. However, where the defendant challenges the sufficiency of indictment for the first time on appeal, a more liberal standard applies, and "it is sufficient that the indictment apprised the accused of the precise offense charged with enough specificity to (1) allow preparation of his defense and (2) allow pleading a resulting

conviction as a bar to future prosecution arising out of the same conduct." *DiLorenzo*, 169 Ill. 2d at 322.

¶ 21    Furthermore, the circuit court may order the State to provide a bill of particulars when an indictment fails to sufficiently specify the particulars of a charged offense to enable the defendant to prepare a defense. 725 ILCS 5/111-6 (West 2010); *People v. Woodrum*, 223 Ill. 2d 286, 301 (2006). A bill of particulars is used "to provide more specificity of detail to supplement a sufficient indictment so as to enable an accused better to understand the nature of the charge against him or better to prepare his defense." *People v. Patrick*, 38 Ill. 2d 255, 260 (1967). "The purpose of a bill of particulars is to give the defendant notice of the charge and to inform the defendant of the particular transactions in question, thus enabling preparation of a defense." *Woodrum*, 223 Ill. 2d at 301-02. A circuit court's decision on a motion for a bill of particulars is reviewed for abuse of discretion. *Id.* at 302. An abuse of discretion will be found only when the circuit court's decision is arbitrary and no reasonable person would adopt the view of the circuit court. *Id.*

¶ 22    Section 111-3(a) of the Criminal Code provides

> "(a) A charge shall be in writing and allege the commission of an offense by:
>
> (1) Stating the name of the offense;
>
> (2) Citing the statutory provision alleged to have been violated;
>
> (3) Setting forth the nature and elements of the offense charged;
>
> (4) Stating the date and county of the offense as definitely as can be done; and
>
> (5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." 725 ILCS 5/111-3(a) (West 2010).

With respect to section 111-3(a)(4) of the Criminal Code, the State "is not required to prove the precise date on which the offenses occurred, but must at least give some indication in the indictment as to when the offenses occurred." *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (2005). We observed in *Guerrero* that, "[t]he date of the offense is not an essential factor in child sex offense cases." *Id.* (citing *People v. Burton*, 201 Ill. App. 3d 116, 123 (1990)). We further noted that in cases involving sexual abuse of children, "flexibility is permitted regarding the date requirement" in section 111-3(a)(4). *Id.* "As long as the crime occurred within the statute of limitations and prior to the return of the charging instrument, the State need only provide the defendant with the best information it has as to when the offenses occurred." *Id.*

¶ 23    Here, we find that the indictment apprised defendant of the precise offenses charged with enough specificity to allow preparation of his defense. We first observe that, while defendant argues on appeal that the indictment was insufficient, at no point either prior to or after defendant filed a motion for a bill of particulars did he move to quash or dismiss the indictment. Defendant's motion for a bill of particulars did not assert that the indictment was insufficient but instead requested more particularized information as to the dates of the alleged offenses and the number of times the charged conduct was alleged to have occurred. As our supreme court observed, a bill of particulars seeks to provide more specificity of detail to supplement a *sufficient* indictment. *Patrick*, 38 Ill. 2d at 260. It follows then that, in order to challenge the sufficiency of the indictment, a defendant must do more than simply request more particularized information. In other words, defendant here requested more

specific details without attacking the sufficiency of the indictment itself. Nor did defendant's posttrial motion for a new trial assert that the indictment was insufficient but instead reiterated that the State had failed to provide more particularized information in response to the motion for a bill of particulars. Here, the indictment included all of the essential elements required by section 111-3(a) of the Criminal Code and provided defendant with notice of the nature of charges against him. The indictment stated the name of the offenses, cited the statutory provisions alleged to have been violated, set forth the nature and elements of the offenses charged, stated the range of dates and the county of the offense, and stated the name of the accused. We also reiterate that the date of the offense is not an essential factor in child sex offense cases (see *Guerrero*, 356 Ill. App. 3d at 27), and therefore any failure to include the precise date of the offense does not render an indictment insufficient. We conclude that the indictment was sufficient and not so overly broad as to impair defendant's ability to present a meaningful defense.

¶ 24     Furthermore, defendant's reliance on the out-of-state decisions in *State v. Baker*, 769 S.E.2d 860 (S.C. 2015), and *People v. Keindl*, 502 N.E.2d 577 (N.Y. 1986), is misplaced. First, we are not bound to follow the decisions of courts of last resort in our sister states, particularly where those decisions involve interpretation of those states' own constitutions and statutes. Second, *Baker* and *Keindl* are distinguishable, as both of those cases involved pretrial motions to quash indictments and were resolved on the specific facts of those cases.

¶ 25     In *Baker*, the defendant was initially indicted in January 2005 on four counts of committing a lewd act upon a minor and one count of criminal sexual conduct with a minor stemming from allegations by the defendant's niece for acts that occurred between May 2002 and September 2002, May 2003 and September 2003, and in June 2004. *Baker*, 769 S.E.2d at 862. In July 2006, the defendant was also indicted for committing a lewd act upon a minor in 2002 against a second victim, who was also the defendant's niece and the sister of the first victim. *Id.* After the initial indictments, the victims alleged that the abuse began in 1998, and prosecutors presented a second set of indictments to the grand jury. On October 26, 2006, the initial indictments were amended to reflect that the defendant committed lewd acts against the first victim between June 1998 and September 2004, while the criminal sexual conduct charges covered the same time period set forth in the initial indictment, and that the defendant committed lewd acts against the second victim between June 1998 and September 1998. *Id.* Prior to the November 13, 2006, trial, the defendant moved to quash the amended indictments as unconstitutionally overbroad and vague, asserting that his ability to present a defense was hindered because the amended indictments alleged acts that occurred over a six-year period without any specificity. *Id.* at 862-63. The trial court denied the motion to quash, and the defendant was ultimately convicted of four counts of committing a lewd act upon a minor against the first victim. *Id.* at 863.

¶ 26     The Supreme Court of South Carolina, in a divided 3-2 opinion—with one of the justices in the majority concurring in the result only—reversed the defendant's convictions. The court found that the defendant "was prejudiced as he was undoubtedly taken by surprise and significantly limited in his ability to combat the charges against him." *Id.* at 864. The court focused on the fact that the amended indictments were returned two weeks prior to trial and set forth a continuous six-year period rather than the three summers identified in the initial indictments. *Id.* Furthermore, the defendant's employment records prior to July 2000 had

been destroyed, and therefore his counsel could not adequately establish the defendant's whereabouts during the expanded time frame in the amended indictments. *Id.*

¶ 27    The dissent rejected any "[*per se*] rule of overbreadth for the mere fact that the time period covered in the indictment is lengthy." *Id.* at 866 (Toal, C.J., dissenting) (citing *State v. Wade*, 409 S.E.2d 780, 783 (S.C. 1991)). The dissent examined the statutory language of the charged offenses and noted, "Because time is not an element of the offenses, and because the time period covered by the indictments occurred prior to the return of the indictments by the grand jury, we must look to the surrounding circumstances leading to the enlargement of time in the indictments." *Id.* at 867. The dissent observed that after the initial indictments, the minor victims recalled that the abuse began earlier, which in the dissent's view was sufficient to broaden the time of the alleged abused in the indictment. *Id.* As for the timing of the amended indictments being returned so close to trial, the dissent observed that the defendant had moved the trial court for a continuance, that the trial court denied that motion, and that the defendant did not raise the propriety of the trial court's denial of his request for a continuance in the supreme court. *Id.*

¶ 28    First, *Baker* is distinguishable from the situation before us because, here, defendant did not move to quash the indictment. Second, the two-justice majority opinion in *Baker* was primarily concerned that the defendant could not present a meaningful defense when the time period in the indictments was enlarged two weeks before trial from three summers to an uninterrupted span of six years time, leaving defendant with little opportunity to develop an alibi defense. Here, the indictment was not amended on the eve of trial, and defendant does not identify how the time frame in the indictment precluded him from preparing his defense. The State provided defendant with all of the discovery it had, including interviews with the victim and police reports, which listed the dates and times of the alleged incidents, whereas the opinion in *Baker* is silent as to what information had been provided to the defendant by prosecutors prior to trial. For these reasons, we find that the holding in *Baker* is distinguishable from the facts before us.

¶ 29    In *Keindl*, the defendant was charged in a 32-count indictment of numerous sexual crimes against his stepchildren over a three-year period. *Kiendl*, 502 N.E.2d at 578. The defendant moved, in relevant part, to quash the indictment for failing to allege with sufficient specificity the time of the occurrence of certain charged offenses. *Id.* at 579. The trial court denied the motion but permitted defendant to request a bill of particulars. *Id.* Prosecutors provided specific dates for some of the counts and narrowed the time period for others, but left other counts unchanged. *Id.* The case proceeded to a jury trial and the defendant was convicted on 26 counts. *Id.* The judgment was affirmed by the New York Supreme Court, Appellate Division. *Id.*

¶ 30    The Court of Appeals of New York vacated the defendant's conviction on 15 counts. The court observed

> "the interval of time set forth in each count must reasonably serve[ ] the function of protecting defendant's constitutional right to be informed of the nature and cause of the accusation [citations] so as to enable him to prepare a defense and to plead the judgment in bar of any further prosecution for the same crime." (Internal quotation marks omitted.) *Id.* at 579-80.

Furthermore, "when time is not an essential element, the indictment is often permitted to state the time in approximate terms, but *** [t]he determination of whether sufficient

- 8 -

specificity to adequately prepare a defense has been provided *** must be made on an *ad hoc* basis considering all relevant circumstances," including the "span of time set forth and the knowledge the People have or should have of the exact date or dates of the crime." (Internal quotation marks omitted.) *Id.* at 581. Many of the counts in the indictment alleged numerous acts in a single count occurring over periods of 10, 12, and 16 months, which the court concluded were "so excessive on their face that they are unreasonable." *Id.* The court also considered that the victims were between the ages of 8 and 13 at the time of the alleged offenses and thus were more capable than younger victims of "discerning, if not exact dates, at least seasons, school holidays, birthdays, or other events which could establish a frame of reference to assist them in narrowing the time spans alleged." *Id.*

¶ 31     *Keindl* is also different from this case. First, the indictment there lumped together several alleged acts into single counts under a "continuous crime" theory. Here, the State did no such thing. Each separate count of the indictment alleged a single act, and thus the indictment was proper in form. This ameliorates the *Keindl* court's concern that "there is such a multiplicity of acts encompassed in single counts as to make it virtually impossible to determine the particular act of sodomy or sexual abuse as to which the jury reached a unanimous verdict." *Id.* at 582. Second, while we agree with *Keindl* that each case should be evaluated under its unique circumstances, we do not believe that under the circumstances of this case that the five-year time period alleged in each count of the indictment was so excessive as to be facially unreasonable. Here, the alleged abuse occurred while T.A. was between the ages of 6 and 11 years old, and her age undoubtedly diminished her ability to recall the dates or times of the alleged abuse. She was, however, able to provide some general information regarding her age and the time of year when the abuse occurred. The State provided this evidence to defendant, and it constituted the most particularized evidence available. We agree with the circuit court's assessment that the State could not provide any more particularized information as to the dates of the abuse, and we conclude that the indictment was not so broad or vague as to impair defendant's constitutional right to prepare a defense, particularly where defendant identifies no prejudice to his ability to prepare a defense.

¶ 32     The thrust of defendant's argument is directed at the indictment being overly broad. Defendant does not specifically argue that the circuit court abused its discretion by refusing to order the State to provide more particularized information in response to defendant's motion for a bill of particulars. Defendant has therefore forfeited any such argument. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2017). Having already concluded that the indictment itself was sufficient, there is no basis from which we might conclude that the circuit court abused its discretion by refusing to order the State to provide additional, particularized information about the dates of the offenses alleged.

¶ 33                                    B. Ineffective Assistance of Counsel

¶ 34     Defendant argues that his trial counsel was ineffective by failing to object to T.A.'s testimony regarding the tally marks she made on her dresser, failing to object to Detective Castaneda's testimony regarding the number of other child sex abuse cases he had worked on, and failing to object to statements made during the State's closing argument. Alternatively, defendant argues that we should review the circuit court's failure to exclude inadmissible or irrelevant evidence for plain error.

¶ 35    Criminal defendants have a constitutional right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984); U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A defendant is denied effective assistance where his counsel's performance fell below an objective standard of reasonableness, and absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Strickland*, 466 U.S. at 684-85. When evaluating a claim of ineffective assistance of counsel, we may address the issue of whether defendant suffered any prejudice from his trial counsel's allegedly deficient performance without first concluding that trial counsel's counsel performance fell below an objectively reasonable standard. *Id.* at 697; *People v. Albanese*, 104 Ill. 2d 504, 527 (1984). To show prejudice, a defendant must establish a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *People v. Smith*, 2012 IL App (1st) 102354, ¶ 168. A probability rises to the level of a "reasonable probability" when it is sufficient to undermine confidence in the outcome or the proceeding. *Id.*

¶ 36                    1. Trial Counsel's Failure to Object to T.A.'s Testimony

¶ 37    Defendant first argues that his trial counsel provided ineffective assistance by failing to object at trial to T.A.'s testimony regarding the tally marks she purportedly made on her dresser. He contends that the tally marks were inadmissible hearsay because they were out-of-court, nonverbal statements offered to prove the fact that defendant committed the abuse and that the statements were unreliable. Defendant argues that he was prejudiced by his counsel's failure to object because T.A.'s statements "were particularly damaging where the State's evidence rested on T.A.'s veracity" in conjunction with the prosecutor's closing argument that the tally marks were a "powerful piece of evidence." Defendant further contends that the State was able to bolster T.A.'s credibility through the tally mark evidence.

¶ 38    We find that defendant was not prejudiced by his trial counsel's failure to object to T.A.'s testimony about the tally marks on the dresser. Prior to trial, defendant's counsel requested that the trial court exclude any evidence about the tally marks on the basis of timeliness, as it was disclosed for the first time one week prior to trial. The circuit court refused to exclude the evidence but told counsel "I will give you all the time you need to prepare." Counsel informed the circuit court that she had met with defendant to discuss the evidence and to determine whether any further investigation could be made or whether there were any additional witnesses, but as a result of that conversation, she "[did not] have any additional investigation based on any new information given to me from my client." At trial, T.A. testified that the tally marks were an "estimation" of the number of times that defendant touched her. On cross-examination, T.A. testified that first time she disclosed the tally marks was one week prior to trial and that she had not previously told the police about the tally marks. She explained that she made the tally marks "on separate occasions in groups," and could not recall when she made the marks. We conclude that the tally mark evidence was diminished where T.A. acknowledged that the marks were not contemporaneous with any abuse and that she could not recall when she made them. Furthermore, defendant's counsel elicited testimony from Naahreet that she recognized the dresser as the one from T.A.'s bedroom and did not recall seeing the marks on T.A.'s dresser during the time they spent together on weekends growing up. Finally, during closing arguments, defense counsel argued that "the reason why Naahreet didn't notice [the tally marks] was because it's a recent

fabrication." Testimony concerning the tally marks provided defendant with an avenue to attack T.A.'s credibility by questioning the validity of her accusations and arguing that T.A. might have fabricated this evidence to bolster her allegations against her father. Without this area of attack, the defense was left with essentially a defense of denying the charges, claiming that the charges were recent fabrications and asserting that T.A.'s accusations were too improbable to believe. Therefore, even if defense counsel should have objected to the introduction of evidence regarding the tally marks, defense counsel's trial strategy was to use the facts surrounding that evidence to cast doubt on T.A.'s credibility. Defendant did not suffer any prejudice, and we conclude that defendant has not established a reasonable probability that, had his trial counsel objected to the evidence of the tally marks, the outcome of the trial might have been different.

¶ 39                2. Trial Counsel's Failure to Object to Detective Castaneda's Testimony

¶ 40    Next, defendant argues that his trial counsel was ineffective by failing to object to Detective Castaneda's testimony that in roughly 85% of the other child sex abuse cases he had worked on, the child victim failed to come forward right away with their allegations of abuse. Defendant contends that Detective Castaneda was not qualified as an expert, that his testimony as to facts in other cases was irrelevant, and that the circuit court compounded the error by sustaining the State's objection to defendant's question as to how many of those other cases resulted in a conviction. Defendant argues that he was prejudiced where the State was allowed to argue during closing argument that T.A.'s delayed outcry was normal.

¶ 41    We again conclude that defendant was not prejudiced by his trial counsel's failure to object to Detective Castaneda's testimony regarding other child sex abuse victims' delayed outcries. First, prior to trial, the circuit court denied the State's motion to allow Castaneda to testify as an expert. The circuit court did, however, allow Castaneda to testify as to the number of child sex abuse cases he investigated that involved delayed outcry, and defendant would be allowed to inquire as to the number of those cases that went to court. As a result of this ruling, defendant's only claim of prejudice is that the State was allowed to argue in closing that T.A.'s delayed outcry was normal. The circuit court, however, admonished the jury that closing arguments are not evidence, and we presume that the jury follows the law that it is given. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Furthermore, during cross-examination, defense counsel elicited testimony from T.A. in which she acknowledged not telling police about the abuse until October 2011 and that she first disclosed the abuse to her then boyfriend in September 2011. T.A. had also testified that after the abuse, defendant told her not to tell anyone, that she felt fear after the abuse, and that defendant told her that if a family member did anything illegal that she should not turn them in because she would be a traitor. Defense counsel then argued in closing that T.A.'s allegations against defendant were "unfortunately what we call recent fabrication." And although counsel's closing arguments are not evidence, defendant's counsel sought to sway the jury by arguing that T.A.'s delayed outcry was simply a lie. Even if Detective Castaneda's testimony potentially normalized T.A.'s delayed outcry, the jury was still in a position to independently evaluate whether, under the circumstances of this case, T.A.'s delayed outcry, in light of her fear and defendant's attempts to urge T.A. to remain quiet about the abuse, affected her credibility. We conclude that defendant has not established a reasonable probability that, had his trial counsel objected to Detective Castaneda's testimony about other victims' outcries, the

outcome of the trial might have been different.

¶ 42    3. Trial Counsel's Failure to Object to Statements Made During Closing Argument

¶ 43    As his final argument for ineffective assistance of his trial counsel, defendant argues that the State made unobjected-to statements in closing to the effect that defendant failed to make any exonerating statements at the time he learned about T.A.'s allegations of abuse. The prosecutor stated,

> "The defendant himself also gives us a lot of evidence in this case. Let's talk about his actions. Let's talk about what happened after October 21, 2011, the day [T.A.] found her voice.
>
> * * *
>
> Now, [defendant] gives us more evidence when he gets to Illinois Masonic, because he talks. And he talks to Danielle Komen and he talks to Jeanette. *** [Komen] goes in to talk about a discharge plan with this guy, and he uses the word, his words now, I'm feeling guilty about what's going on with my daughter.
>
> And [Komen] asks him, what's going on with your daughter? What did you do to her? And he says that he touched her butt, and then he admits a little more. He touched her vagina under her clothes multiple times, but he doesn't really know when. ***
>
> Now what else did he say to Danielle Komen? Are you going to tell my mom? Am I going to go to jail? Really. It's all about him. Not how is [T.A.] What's going on. Why is she saying these things. Oh, no that wasn't his response. ***
>
> And then Jeanette confronts him at Illinois Masonic. And what does he say to Jeanette? He tells Jeanette, I don't know unless I was drunk. Again, really. Use your common sense here. He didn't start screaming to Jeanette, what is going on with our daughter? Nope. Why is she doing this? Nope. I don't know unless I was drunk."

¶ 44    Defendant contends that the State's argument improperly shifted the burden to defendant to present reasonable doubt as to his guilt and that he was prejudiced as evidenced by a jury note asking how certain the jury needed to be in order to find a person guilty beyond a reasonable doubt.

¶ 45    The State's closing argument, however, was based on the evidence presented during trial and emphasized defendant's own admissions. Defendant cannot claim that he suffered any prejudice as a result of his trial counsel's failure to object to the State's references to trial evidence in closing argument.

¶ 46    Next, defendant argues that the State made an improper statement during rebuttal argument. Defense counsel stated in her closing, in reference to defendant's statements to Jeanette, "What could he say. I don't know anymore. I was drunk. He's completely shut down and given up, because what does life mean if this is what he's going to be accused of from his daughter." In rebuttal, when discussing defendant's statement to Jeanette, the prosecutor argued, "What's his response? How dare you think I could this to my daughter? I would never do this my daughter. No. I don't know. Unless I was drunk." Defense counsel's statements were not supported by any trial evidence, and the State's rebuttal emphasized that

defendant's only response to being confronted by Jeanette was, "I don't know. Unless I was drunk."

In context, it is clear that none of the State's statements attempted to shift the burden to defendant to present a reasonable doubt as to his guilt and did not suggest that defendant's lack of exonerating statements was proof of his guilt. The State's closing argument emphasized the only evidence presented at trial as to what defendant said when confronted with his daughter's accusation, and the State's rebuttal argument was fair comment in response to defendant's argument. We conclude that defendant has not established a reasonable probability that, had his trial counsel objected to the State's statements in closing, which were all based on the evidence at trial, the outcome of the trial might have been different.

### 4. Plain Error

Finally, defendant argues that we should review the circuit court's admission of T.A.'s testimony as to the tally marks, Detective Castaneda's testimony as to other sexual abuse victims' delayed outcries, and the State's statements during closing arguments for plain error. Defendant argues that both prongs of plain error are implicated because the evidence was closely balanced, that his counsel's errors threatened to tip the scales of justice against defendant, and that the cumulative effect of his counsel's alleged errors deprived defendant of his right to a fair trial. However, we have already determined that none of the alleged errors resulted in any prejudice to defendant, and we conclude that none of the errors were serious enough to warrant plain error review.

### C. Illinois Supreme Court Rule 431(b)

Defendant next argues that the circuit court failed to comply with Illinois Supreme Court Rule 431(b) because it failed to ask the first panel of potential jurors—from which eight jurors were selected—if they understood the principle that a defendant is not required to present any evidence. Although defendant forfeited this issue by failing to raise it at any time in the circuit court, he argues that the circuit court's error amounts to first-prong plain error and that the evidence was closely balanced.

Rule 431(b) provides:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

The State correctly asserts, and defendant concedes in his reply, that defendant has forfeited review of this error because he failed to object during *voir dire* and failed to include this issue in his posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Rule 615(a), however, permits an appellate court to excuse a defendant's forfeiture and reach the merits of

a claim that amounts to plain error. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *Sebby*, 2017 IL 119445, ¶ 48.

¶ 54 The plain error doctrine allows a court of review to consider a forfeited error when "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005).

> "In the first instance, the defendant must prove 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him. The State, of course, can respond by arguing that the evidence was not closely balanced, but rather strongly weighted against the defendant. In the second instance, the defendant must prove there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.* at 187.

¶ 55 Defendant argues that the circuit court's error constitutes first-prong plain error. His argument is consistent with our supreme court's holding that a Rule 431(b) error is usually only subject to first-prong plain error analysis. *Sebby*, 2017 IL 119445, ¶ 52. We must therefore determine whether the evidence here was closely balanced such that the circuit court's error threatened to tip the scales of justice against defendant. This requires us to "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. We are required, however, to first determine whether error occurred. *Id.*

¶ 56 Rule 431(b) "mandates a specific question and response process." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). "The rule requires questioning on whether the potential jurors both understand and accept each of the enumerated principles." *Id.* Accordingly, failure to ascertain whether the jurors both understand and accept the principles constitutes a violation of Rule 431(b) and is therefore error. *Id.*; see also *People v. Wilmington*, 2013 IL 112938, ¶ 32.

¶ 57 There is little doubt that error occurred here, and at oral argument, the State conceded that an instructional error occurred. Our review of the record shows that the third instruction given by the trial court did not fully comply with Rule 431(b) insofar as the circuit court failed to question the potential jurors as to whether they understood the defendant was not required to offer any evidence on his behalf.

¶ 58 The State argues, however, that defendant is not entitled to any plain error relief because he presented evidence on his own behalf. On this point, we agree. As our supreme court has explained, "a defendant must show prejudice to obtain relief under the first prong of the plain error doctrine." *Sebby*, 2017 IL 119445, ¶ 68. "What makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive." *Id.*; see also *Herron*, 215 Ill. 2d at 187 ("[T]he defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him."). Here, defendant simply cannot obtain plain error relief based on the circuit court's failure to ask potential jurors whether they understood that a defendant is not required to offer any evidence on his behalf because defendant *did* offer evidence on his behalf at trial. Defendant called Detective Castaneda and Naahreet as

witnesses in his case in chief. There was simply no possibility that the circuit court's instructional error may have affected the result of the trial.

¶ 59    Furthermore, defendant is not entitled to relief under first-prong plain error because the evidence was not closely balanced. Defendant argues that the State's case was premised on T.A.'s credibility. Defendant argues that T.A. originally told Jeffrey that she did not know who had abused her, that she gave Detective Castaneda inconsistent accounts of the number of times she was abused, and that she waited roughly four years to come forward with her allegations of abuse. At trial, defendant sought to attack T.A.'s credibility by highlighting these issues and by highlighting that T.A. failed to disclose the tally marks on her dresser until a week before trial. He further sought to show that T.A. had a bad relationship with defendant and resented him due to an incident where he cut off her hair when she had lice. He further attempted to minimize the importance of his own statements to Jeanette and Komen, arguing that he had been medicated with morphine at the time he made those statements.

¶ 60    When considering whether evidence is closely balanced, we must "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. We must assess the evidence on the elements of the offense, as well as any evidence regarding the witnesses' credibility. *Id.*

¶ 61    Section 12-16(b) of the Criminal Code of 1961 provided[2] that "The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual conduct with a victim who was under 18 years of age *** and the accused was a family member." 720 ILCS 5/12-16(b) (West 2010). Section 12-14.1(a)(1) of the Criminal Code of 1961 provided, in relevant part,[3]

> "(a) The accused commits predatory criminal sexual assault of a child if:
>
> (1) the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed[.]" 720 ILCS 5/12-14.1(a)(1) (West 2010).

¶ 62    Here, T.A. was 17 years old at the time of trial. She testified about two occasions on which defendant abused her. The first incident, which occurred when T.A. was either six or seven years old, involved defendant pulling T.A. on top of him rubbing his erect penis against T.A.'s vagina while they both were wearing underwear. The second incident, which occurred when T.A. was nine years old, involved defendant having sexual intercourse with her and ejaculating on the bed sheet. There was, therefore, evidence that defendant committed each element of both aggravated criminal sexual abuse and predatory criminal sexual assault of a child. T.A. also testified that after the abuse, defendant told her not to tell anyone, and that people who turned in family members for doing something illegal were traitors. Furthermore, Komen testified that defendant acknowledged that he touched T.A.'s butt and that he had touched her vagina underneath her clothes, and that he had touched her multiple times, although defendant did not recall any specific instances and did not admit to having sexual intercourse with T.A. And in response to Jeanette confronting defendant about

---

[2]Section 12-16 of the Criminal Code of 1961 was subsequently renumbered as section 11-1.60 of the Criminal Code of 2012 (720 ILCS 5/11-1.60 (West 2012)), with no substantive changes.

[3]Section 12-14.1 of the Criminal Code of 1961 was subsequently renumbered as section 11-1.40 of the Criminal Code of 2012 (720 ILCS 5/11-1.40 (West 2012)), with no substantive changes.

- 15 -

the abuse, defendant said, "I don't know unless I was drunk." There was no testimony from any other witness that contradicted T.A.'s testimony as to defendant's abuse, or Jeanette and Komen's testimony as to defendant's statements. Furthermore, although defendant cross-examined T.A. and elicited testimony that she had not previously disclosed the tally marks on her dresser and the circumstances of her delayed outcry about the alleged abuse, there is no evidence that contradicts T.A.'s testimony about the incidents of abuse. Therefore, this case does not involve a "contest of credibility." See *People v. Naylor*, 229 Ill. 2d 584, 606-07 (2008) (finding the evidence closely balanced where both the State's and the defendant's witnesses provided credible testimony as to the parties' respective version of events); see also *Sebby*, 2017 IL 119445, ¶¶ 55-63 (same).

¶ 63    Having considered the evidence presented at trial, as well as defendant's arguments as to T.A.'s credibility, we conclude that the evidence of defendant's guilt was not closely balanced, and that the circuit court's instructional error did not threaten to tip the scales of justice against defendant. We therefore conclude that defendant is not entitled to relief under first-prong plain error.

¶ 64    Finally, we reiterate that compliance with Rule 431(b) is mandatory and noncompliance calls into question the integrity of the jury's verdict. We recognize that veteran, experienced, and highly-regarded circuit court judges are so well-versed in giving required instructions and admonishments that, on occasion, inadvertent mistakes occur and a required instruction is missed. The fact that the omission in this case was not objected to during *voir dire* or included in defendant's posttrial motion likely indicates that veteran prosecutors and defense counsel also mistakenly believed that the required instruction had been given. Our circuit court judges are committed to ensuring that the rights of all defendants are preserved, yet everyone makes mistakes. Clearly, some mistakes can be avoided with the use of helpful reminders, such as checklists. We urge all circuit court judges to exercise the utmost care when asking potential jurors whether they both understand and accept each of the principles in Rule 431(b). Far from a rote procedure, asking potential jurors whether they understand and accept the bedrock principles embodied in Rule 431(b) contributes to affording criminal defendants the basic constitutional right to a fair and impartial jury to which they are entitled.

¶ 65                                D. T.A.'s Mental Health Records

¶ 66    Finally, defendant argues that he was deprived of his right to a fair trial where the circuit court denied his request to subpoena T.A.'s mental health records and refused to conduct an *in camera* review of those records. At the hearing on defendant's request to issue subpoenas, defense counsel stated that defendant was seeking psychiatric and mental health records because T.A. had "been in mental health treatment and therapy *** throughout the years about [*sic*] before she made allegations that she was being abused" by defendant. Defense counsel argued that T.A. "may have been questioned by a therapist about whether or not anybody was abusing her in any way," and that if T.A. had denied being abused, "we would be entitled to have these records to determine, not only that, but whether or not [T.A.] has other personality disorders that affects [*sic*] her credibility, her moral turpitude for telling the truth."

¶ 67    In response, the State argued that defendant was seeking records from five different treatment locations or providers that T.A. visited after she disclosed the allegations of abuse. The State asserted that the records sought by defendant were privileged under section 8-802.1

- 16 -

of the Code of Civil Procedure (Code) (735 ILCS 5/8-802.1 (West 2010)), which governs the confidentiality of statements made to rape crisis personnel. The State further argued that defendant had not made "any showing *** that there is any impeachment they believe that is contained in those records that could not be obtained by any other source."

¶ 68 In reply, defense counsel argued that section 8-802.1 of the Code did not apply because none of the providers met the definition of a "rape crisis counselor" as defined by the statute and that it would be incumbent on the provider to assert such a privilege.

¶ 69 The circuit court denied defendant's request for T.A.'s records "that have arisen since the case was reported." The circuit court stated, "If you have other records you're seeking that come beforehand, I would be happy to entertain a motion for those." Defense counsel then stated that she "was not privy to which counselors specifically were providing the treatment beforehand." The circuit court responded, "Well, it's a fishing expedition and it's not allowed for medical records, psychiatric or otherwise."

¶ 70 On appeal, defendant argues that T.A.'s mental health records, while potentially privileged, might contain relevant information. He contends that he is entitled to a remand to have the circuit court review those mental health records *in camera* to determine whether the records contain relevant information that could have been used to impeach T.A., and if so, he should receive a new trial. We disagree.

¶ 71 A criminal defendant has constitutional rights "to have compulsory process for obtaining witnesses in his favor" (U.S. Const., amend. VI) and a due process right to a fundamentally fair trial (*People v. Wheeler*, 151 Ill. 2d 298, 305 (1992)).

¶ 72 The parties disagree as to our standard of review. Defendant relies on *People v. Newborn*, 379 Ill. App. 3d 240 (2008), to argue that the *de novo* standard of review applies because the circuit court failed to exercise any discretion in determining whether the requested mental health records might be relevant and impeaching. The State, however, frames the issue differently. The State begins with the circuit court's denial of defendant's request to issue subpoenas to T.A.'s mental health providers and asserts that the circuit court has "wide discretion in deciding whether a subpoena should issue." *People v. Jones*, 295 Ill. App. 3d 444, 450 (1998). Defendant's reply brief to this court does not address the State's argument. As discussed above, the record on appeal demonstrates that the State objected to the issuance of the subpoenas in part because defendant was seeking T.A.'s pre-accusation psychiatric and mental health records without having identified any materials therein that might be impeaching. We therefore must first consider whether the circuit court abused its discretion in denying defendant leave to subpoena those records. The circuit court "abuses its discretion when its decision is fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004).

¶ 73 We find no abuse of discretion. At the hearing on whether the subpoenas should issue, defendant asserted that he was seeking records from five different providers but was unable to identify which of the providers T.A. had seen prior to coming forward with her allegations. Defendant's theory was that, prior to coming forward, T.A. might have been asked whether she was being abused in any way and she might have denied being abused by her father. Defendant's reply brief in the circuit court in support of his request contended that T.A. "suffered from emotional issues including depression and anti-social behaviors. According to family members, symptoms she exhibited included: making untrue and make believe statements. Any records of such conditions would be relevant to [T.A.'s] credibility as a

witness." Defendant did not, however, identify the "family members" who purportedly said that T.A. had a history of making untrue statements or identify what those allegedly untrue statements were.[4] The circuit court could therefore reasonably conclude that any impeachment material contained in T.A.'s pre-accusation treatment records was available from other sources.

¶ 74     Furthermore, in denying defendant's request to issue the subpoenas, the circuit court delineated T.A.'s pre-outcry treatment records from her post-outcry treatment records and invited defendant to renew his request for pre-outcry treatment records. Defendant does not direct our attention to any portion of the record to suggest that he subsequently made a more particularized request for T.A.'s pre-outcry treatment records. Therefore, we cannot say that the circuit court abused its discretion in denying defendant leave to subpoena all of T.A.'s pre-outcry treatment records in the hopes of finding some pre-outcry impeachment material. The circuit court could reasonably conclude that the absence of any relevant specificity as to which providers T.A. had seen pre-outcry, coupled with defendant's broad claim that T.A. might have discussed her abuse or been observed as having any tendency of "making untrue and make believe statements," was tantamount to a "fishing expedition." Since the circuit court did not abuse its discretion in denying defendant's broad request to subpoena all of T.A.'s treatment records, the circuit court did not err by refusing to grant leave to subpoena pre-outcry medical and treatment records and to thereafter conduct an *in camera* review of those records.

¶ 75                                    CONCLUSION
¶ 76     For the foregoing reasons, the judgment of the circuit court is affirmed

¶ 77     Affirmed.

---

[4]We also note that defendant did not proffer those family members during the hearing on the motion or call them as witnesses at trial.